**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Gilbert Unified School District No. 41, | ) | No. CV 11-00510-PHX-NVW |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| CrossPointe, LLC; Joan M. Keebler, | ) | |
| Defendants. | ) | |

Before the Court is Defendants' Motion to Dismiss Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. 23.)

**I.    Background**

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  Therefore, for the limited purpose of deciding the motion to dismiss the Amended Complaint, the Court assumes to be true the following facts alleged in the Amended Complaint or stated in documents central to and attached to or referenced in the Amended Complaint.

**A.    The RFP**

In December 2007, the Gilbert Unified School District No. 41 ("District") issued request for proposals ("RFP") #08-031-01-13 to procure a student information system that would "allow compliance with State and Federal requirements at a reasonable and

1    affordable price under the terms of the State Procurement Code."  The RFP stated that the

2    District sought to begin a test implementation of the new system by April 2008 and to

3    begin actual use in August 2008.  It specified that the new system must collect, validate,

4    and report student information required by the Arizona Department of Education and

5    electronically submit the information to the Arizona Department of Education.  The RFP

6    also stated the District's preference for a "commercial off-the-shelf" system that would

7    require minimal customization for use by the District.

8         The RFP specified requirements for training, implementation, installation services,

9    support, and maintenance.  It provided detailed product specifications for the student

10   information system and general system requirements.  It also required Offerors to respond

11   to each of numerous specific software features, either indicating the proposed system

12   provided the feature or providing an explanation for the deficiency.  For example, one

13   general system feature stated:  "The application software is completely integrated; e.g.,

14   updating of any data element needs to be done only once, to be reflected throughout all

15   application modules."  Another stated:  "The system **ensures** 99.5% uptime reliability."

16   Also:  "All system reports, including Arizona State Reporting (e.g. SAIS), can occur

17   while the system is online and does not require 'locking out' users."

18        The "Uniform Instructions to Offerors" attached to the RFP stated the following

19   under the subheading "Offer Preparation":

20        C.    Evidence of Intent to Be Bound.  The Offer and Acceptance form[1]
          within the [RFP] shall be submitted with the Offer and shall include a
21        signature by a person authorized to sign the Offer.  The signature shall
          signify the Offeror's intent to be bound by the Offer and the terms of the
22        Solicitation and that the information provided is true, accurate, and
          complete.  Failure to submit verifiable evidence of an intent to be bound,
23        such as an original signature, shall result in rejection of the Offer.

24        D.    Exceptions to Terms and Conditions.  All exceptions included with
          the Offer shall be submitted in a clearly identified separate section of the
25        Offer in which the Offeror clearly identifies the specific paragraphs of the

26

27        [1]The copy of the RFP attached to the Amended Complaint does not include an Offer
     and Acceptance form.  Neither does the copy attached to the District's response to the motion
28   to dismiss or CrossPointe's response to the RFP.

[RFP] where the exceptions occur.  Any exceptions not included in such a section shall be without force and effect in any resulting Contract unless such exception is specifically referenced by the Procurement Officer in a written statement.  The Offeror's preprinted or standard terms will not be considered as a part of any resulting Contract.

The RFP also included eight pages of Uniform Terms and Conditions.  They included:

2.    F.    <u>No Parol Evidence</u>.  This Contract is intended by the parties as a final and complete expression of their agreement. . . .

5.    A.    <u>Amendments</u>.  . . . The Contract may be modified only through a Contract Amendment within the scope of the Contract unless otherwise permitted by the Special Terms and Conditions.  . . . .

**7.    Warranties**

. . . .

B.    <u>Quality</u>.  Unless otherwise modified elsewhere in these terms and conditions, the Contractor warrants that, for one year after acceptance by the School District/public entity of the materials or services, they shall be:

    1.    Of a quality to pass without objection in the trade under the Contract description;

    2.    Fit for the intended purposes for which the materials or services are used;

    . . . .

    5.    Conform to the written promises or affirmations of fact made by the Contractor.

C.    <u>Fitness</u>.  The Contractor warrants that any material or service supplied to the School District/public entity shall fully conform to all requirements of the Contract and all representations of the Contractor, and shall be fit for all purposes and uses required by the Contract.

. . . .

E.    <u>Exclusions</u>.  Except as otherwise set forth in this Contract, there are no express or implied warranties o[f] merchant ability [*sic.*] or fitness.

9. **Contract Termination**

. . . .

E.   <u>Termination for Default</u>.

1.     In addition to the rights reserved in the Uniform Terms and Conditions, the School District/public entity reserves the right to terminate the Contract in whole or in part due to the failure of the contractor to comply with any term or condition of the Contract, to acquire and maintain all required insurance policies, bonds, licenses and permits, or to make satisfactory progress in performing the Contract.  The Procurement Officer shall provide written notice of the termination and the reasons for it to the Contractor.

. . . .

3.     The School District/public entity may, upon termination of this Contract, procure, on terms and in the manner that it deems appropriate, materials and services to replace those under this Contract.  The Contractor shall be liable to the School District/public entity for any excess costs incurred by the School District/public entity in procuring materials or services in substitution for those due from the Contractor.

B.   **CrossPointe's Proposal in Response to the RFP**

In January 2008, CrossPointe LLC submitted a lengthy proposal in response to the RFP ("Proposal").  The Proposal stated that CrossPointe develops and sells computer software and services for use by K-12 school districts:  "[T]he sole mission of CrossPointe is providing 'Best of Breed Mission-Critical' ERP and Student Information Management and Reporting services that meet the data analysis and information needs of 21st Century School Districts."  It also stated that "Joan Keebler, President/CEO and founder of CrossPointe, heads up the overall management team of CrossPointe and is responsible for the 'day-to-day' operations and strategic direction for the Company."

The Proposal was signed by James W. Dougherty, Chief Technology Officer, and included a cover letter from Keebler as Chief Executive Officer.  The cover letter stated that Keebler was authorized to submit the Proposal as required by the District's Request for Proposal Number 08-031-01-13.

- 4 -

1    The Executive Summary of the Proposal included the following statement:

2    "Product reliability, stability, and ease of use, means no customer has failed in their

3    efforts to implement and utilize the features and benefits of our application suite."  (Doc.

4    23-1 at 5.)  Among other things, the Proposal stated:

5    **CrossPointe Schools OnLine**$^{TM}$ is a fully 'integrated', yet modular, (single
     ANSI compliant Enterprise class) Relational Database that is a COTS
6    (Commercial-off-the-shelf) solution specifically designed for the K-12
     market sector.  **CrossPointe Schools OnLine**$^{TM}$ has been designed based
7    on a 'fully configurable' Service Oriented Architecture (SOA) that allows
     the system to meet the unique operational and reporting needs of Gilbert
8    Public Schools without having to make extensive (any) modifications to the
     base application code.  Gilbert customization and configuration is
9    accomplished during the implementation phase through the establishment of
     District defined 'Control Records', Prompt Boxes, Reporting Codes, and
10   Help text.

11   . . . .

12   Data Conversion:

13   CrossPointe appreciates the difficulty involved in converting a growing
     school district like Gilbert from your CIMS Student Information System to
14   newer technologies.  CrossPointe is very familiar with the CIMS system
     currently in use by the Gilbert School District.  CrossPointe's staff has
15   years of experience in converting large school districts (greater than
     100,000 students) with legacy Student Systems, such as Pearson's CIMS
16   system, to CrossPointe's products including the training [of] all key
     stakeholders.  The CrossPointe team consists of K-12 professionals with
17   significant experience in and understanding of large school systems and
     their unique requirements.

18
     The CrossPointe conversion team will data "map" all information from
19   Gilbert's existing CIMS student system into the appropriate locations in the
     CrossPointe database.  This will be a cooperative effort between
20   CrossPointe and Gilbert in that CrossPointe will convert and scrub the data;
     but it will be the responsibility of the Gilbert staff to 'validate' the accuracy
21   of the converted data.  Although, electronic conversion of Gilbert supplied
     data is the norm there are also some data elements where it is more cost
22   effective to 'hand convert' (hand key) the data.

23   . . . .

24   State Reporting:

25   CrossPointe is currently deployed and operating in a number of states and is
     complying with all state requirements.  The CrossPointe database is
26   extremely comprehensive, extensible, and has great breadth in all of the
     data elements captured as defined by the DOE and state reporting agencies,
27   and can meet the reporting requirements of the State of Arizona.  The
     Student Services development team "maps" required elements that are
28   necessary to meet State Reporting requirements and incorporates them into

- 5 -

the current **CrossPointe Student Records OnLine<sup>TM</sup>** State Reporting module.

(Doc. 23-1 at 25-26.)

The Proposal also stated:

In response to the requirements of this RFP, CrossPointe proposes deploying their 'fully integrated' **CrossPointe Student Records OnLine<sup>TM</sup>** COTS (Commercial Off-the-Shelf) Student Information System which fully meets the intent of this RFP.

. . . .

CrossPointe appreciates the difficulty involved in converting a growing school district like Gilbert from your CIMS Student Information System to newer technologies. CrossPointe is very familiar with the CIMS system currently in use by the Gilbert School District and has recently completed four CIMS student conversions and implementations in the past 2 years. CrossPointe's staff has years of experience in converting large school districts (greater than 100,000 students) with legacy Student Systems, such as Pearson's CIMS system, to CrossPointe's products including the training [of] all key stakeholders.

CrossPointe will work with the Gilbert implementation team to assure 'Test System Operational Capability' (TSOC) no later than 1 April 2008. Upon achieving TSOC the system will be available for the CrossPointe conversion team to begin the loading of the existing Gilbert Student data for validation by Gilbert Subject Matter Experts (SME's). The current implementation goal is to have [] all conversion and configuration activities completed by August 2008 to support the opening of school for the beginning of the 2008/2009 School Year.

(Doc. 23-1 at 28.)

The Proposal described features of CrossPointe Student Records OnLine<sup>TM</sup>, which included:

The database is fully integrated with one-time collection of information that is shared by all components of the system. . . .

Special program referral, evaluation, staffing, and plan management are supported for any type of program the district wishes to define. . . .

The system "snapshots" the database on demand to create state reporting files.

Interactive facilities that support adjusting and correcting entries, with an audit trail, enable modification of the database "snapshot".

(Doc. 23-1 at 32-34.)

1    Further, the Proposal responded to the RFP's 28-page list of specific software

2    features and stated that the proposed system complied with all but five requirements, two

3    of which would be satisfied in a future release.  The Proposal included comments

4    clarifying six of its responses.  For example, the RFP requires:  "The system supports

5    alpha/numeric course codes up to 12 characters in length, and 4 digit section codes."  The

6    Proposal indicates the proposed system does not satisfy that requirement, and the

7    clarification states:  "CrossPointe allows for a maximum length of 8 alpha/numeric course

8    codes.  What do the 12 characters represent?  This requires further clarification from

9    GPS."

10    The Proposal also included a sample project schedule that "depicts the finite levels

11    that all tasks are monitored and managed throughout the entire implementation process."

12    The Proposal stated:  "At the 'Implementation Kickoff' meeting the depicted milestones,

13    assumptions, and risks will be adjusted in concert with the Gilbert Implementation so that

14    all key milestones can be achieved and the system is ready to "Go Live" beginning of

15    [*sic.*] August of 2008 for the start of the 2008/2009 academic school year."  (Doc. 23-2 at

16    40.)

17    Under the heading "Summary of Total Software, Professional Services, and

18    Maintenance Costs," the Proposal identified $1,045,500 for software license fees,

19    $441,800 for conversion, training, implementation, and project management, and

20    $111,513 for the first year of maintenance and support after a 60-day warranty period.

21    Travel and lodging costs were stated as $75,000, but to be billed in arrears based on

22    actual costs.  The total, including $75,000 for travel costs, was $1,673,813.

23    **C.    The District's Acceptance of CrossPointe's Response to the RFP**

24    On February 12, 2008, the District's Governing Board adopted a resolution

25    awarding multiterm contracts to CrossPointe "under the terms and conditions of RFP 08-

26    031-01-13."  By letter dated February 14, 2008, the District's manager of purchasing

27    informed CrossPointe that it had awarded the student information system bid to

28    CrossPointe and was "accepting the terms and conditions offered in your bid response."

1    On February 20, 2008, the District's assistant superintendent, Clyde R.

2  Dangerfield, Esq., sent a letter to CrossPointe titled "LETTER OF INTENT TO

3  PURCHASE," which stated: "Please accept this Letter of Intent to Purchase the Student

4  Information System that was awarded to your company on RFP #08-031-01-13 in the

5  amount of $1,673,813 as Gilbert Public Schools['] intent to purchase the entire system as

6  presented and accepted in the above bid."

7    **D.    The CrossPointe Master License Agreement**

8    On February 20, 2008, on behalf of the District, Dangerfield executed the

9  CrossPointe Master License Agreement, which states that it supplements and governs

10  each Product Order Form Software End User Agreement entered into between the parties.

11  Joan Keebler, as Chief Executive Officer for CrossPointe, signed the Master License

12  Agreement on February 26, 2008.  Dangerfield and Keebler also initialed four alterations

13  in the printed text of the Master License Agreement.  Attached to the Master License

14  Agreement is a Product Order Form/End User Agreement, also executed by Dangerfield

15  and Keebler on February 20 and 26, 2008, respectively.

16    The Master License Agreement includes the following provisions:

17    7.    Product Warranty.  During the Support Period CrossPointe warrants
         that (the "Product Warranty"):
18
19    Media.  The Product media as provided by CrossPointe will be free of material
         defects.

20    Viruses.  Before Product delivery by CrossPointe, CrossPointe will use up-
         to-date, commercially available virus scanning and cleaning products, and
21         will not, based on the results of that scanning and cleaning, deliver to the
           Client Products containing any computer viruses, time bombs, harmful and
22         malicious data, or other undocumented programs which inhibit Product use
           and operation.  When properly installed, the unmodified Software provided
23         by CrossPointe for the CrossPointe Supported Products will operate
           materially and substantially as described in the Documentation for that
24         Software.

25    THE WARRANTIES REFERENCED IN THIS AGREEMENT ARE IN
         LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED,
26         INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR
           FITNESS FOR A PARTICULAR PURPOSE.  CROSSPOINTE DOES
27         NOT WARRANT THAT THE SOFTWARE IS FREE OF
           NONMATERIAL DEFECTS.  CROSSPOINTE DOES NOT REPRESENT
28         THAT THE SYSTEMS WILL MEET THE CLIENT'S REQUIREMENTS

OR THAT THE OPERATION OF THE SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE.

. . . .

9.      Remedies.  The Client's exclusive remedies for breach of the Product Warranty or Support are:

a.      CrossPointe will provide Support to repair or replace the Products to enable the Products to comply with the Product Warranty.

b.      If CrossPointe does not comply with Section 9(a) within the Cure Period (as defined below), the Client may recover direct damages for the CrossPointe Supported Products subject to the damage claim, including up to a refund of the License Fees or Service Fees paid by the Client to CrossPointe, subject to the time periods and limitations described in Section 14.  Client may also elect to terminate Support, the Subscription Services, the License or the Agreement if CrossPointe's breach is not cured within the Cure Period. . . .  "Cure Period" means the period of time reasonably required after notice from Client for CrossPointe to cure a breach in accordance with CrossPointe's standard Support practices.  Sections 1, 2, 5, 8b, and 10 through 22 shall survive any termination of the Agreement.

. . . .

14.      Limitations of Liability.  In no event will CrossPointe, CrossPointe's Third Parties or the Client be liable for indirect, incidental, punitive, exemplary, special or consequential damages, or damages for loss of profits, revenue, data or use, incurred by either Party, whether in contract or tort, even if the other Party has been advised of the possibility of such damages. Neither Party will seek or apply for such damages.  CrossPointe's and its third Parties' aggregate liability for damages to the client for the Agreement, the Products, the Product Warranty, Support or the Subscription Services, whether in contract or tort, shall be limited to actual direct money damages in an amount not to exceed:  (a) the License Fees paid by the Client to CrossPointe for the Products subject to the damage claim if the claim arose within one year after the date of the earliest Product Order Form for those Products, (b) the most recent annual Service Fees paid by Client to CrossPointe for the Products subject to the damage claim if the claim arose more than one year after the date of the earliest Product Order Form for those Products or (c) the most recent annual Subscription Services Fees paid by Client to CrossPointe for the Subscription Services subject to the damage claim.  The Parties will each use reasonable efforts to mitigate their damages.  These limitations represent the agreed allocation of risk. THE FOREGOING LIMITATION OF LIABILITY SHALL REMAIN IN FULL FORGE AND EFFECT REGARDLESS [OF] WHETHER CLIENT'S REMEDIES HEREUNDER HAVE FAILED THEIR ESSENTIAL PURPOSE.

. . . .

20.      General.

a.      Unless otherwise specifically agreed in writing by an authorized representative of Client and a Vice President or higher ranking officer of CrossPointe, this Agreement will solely govern any present or future purchases/licenses by Client from CrossPointe. Any additional Schedules shall be attached and incorporated into this Agreement by reference.

b.      Each party acknowledges that it has read this Agreement, understands it, and agrees to be bound by its terms.  This Agreement, along with the respective Product Order Forms and attachments, is the complete and exclusive statement of the Agreement between the parties with respect to the System and shall supersede all prior proposals, understandings and all other agreements, oral and written. The terms and conditions in this Agreement shall take precedence over the terms and conditions included in all purchase orders and other documentation submitted by the Client pursuant to this Agreement.  This Agreement may not be modified or altered except by a written instrument duly executed by both parties.

. . . .

k.      The Agreement may be amended only in writing signed by the Parties, except that CrossPointe may, upon notice to Client and without Client's signature, amend a Product Order Form to correct errors without increasing the License Fees.  All purchase orders, prior agreements, representations, statements, requests for proposal, proposals, negotiations, understandings and undertakings concerning the Products, Support or Subscription Services are superseded by the Agreement.

(Doc. 23-5 at 8-13.)

The Product Order Form/End User Agreement lists products, *e.g.*, CrossPointe Student Records Online, and related license fees, which total $1,395,000, but are discounted to $1,045,500.  It also identifies maintenance fees of $111,513, project fees (for conversion, training, implementation, and project management) of $441,800, and a "fixed bid price" of $75,000 for travel and lodging.  It states the total due is $1,673,813.

Under the heading "Special Terms and Conditions," the Product Order Form/End User Agreement states in part:

CrossPointe will invoice Gilbert for the License Fees ($1,045,500.00) and 1/3 Project Fees ($172,267.00) for a total of 1,217,767.00 in association with the presentation of the Master License Agreement, Maintenance Agreement, and Product Order Form for signing by client.  CrossPointe will honor a Letter of Intent from Gilbert concerning payment.  Upon board approval of funding, Gilbert will notify CrossPointe that a purchase order is forth coming.  Gilbert will process payment of $1,217,767.00 within 20 days of board approval.  Upon receipt of payment, CrossPointe will ship object code software via FedEx within 2 days.  At time of object code

1   software shipping, CrossPointe will issue a maintenance invoice in the
    amount of $111,513.00 which will be due within 60 days after the ship date.
2   Within two months of the go live date, CrossPointe will ship source code
    for escrow purposes upon agreement with Gilbert as to location.
3   CrossPointe will invoice another 1/3 of Project Fees ($172,267.00) on or
    about May 15, 2008 – payment is net 20.  CrossPointe will invoice final 1/3
4   of Project Fees ($172,266.00) on or about August 1, 2008 – payment is net
    20.
5
    . . . .
6
    State Reporting:  CrossPointe will deliver completed Arizona State
7   Reporting (SAIS Compliance) on or about July 1, 2008, in order to allow
    testing prior to Gilbert's first need to report to the state in August 2008.
8   CrossPointe shall develop all reports required by the Arizona Department of
    Education for SAIS Compliance.  In addition to ADE required reports,
9   CrossPointe shall customize up to 15 reports as part of the implementation.
    This accounts for speciality reports such as Transcripts, Report Cards,
10  Eligibility Reports, Mailing Labels, and District specific reports.
    Additional reports requested by Gilbert, but not mandated by ADE may be
11  subject to additional charges.

12  (Doc. 23-5 at 16.)

13  **E.    The Parties' Performance**

14      CrossPointe began its performance with reference to the specific performance

15  requirements, deadlines, and other terms and conditions stated in the RFP and the

16  Proposal.  The District performed all of its duties and obligations as stated in the RFP and

17  the Proposal.  The District paid CrossPointe approximately $1.7 million.

18      CrossPointe failed to successfully install the student information system and

19  perform the other required services by the date CrossPointe's performance was due or by

20  any extended deadline that CrossPointe promised to meet.  The system as installed did not

21  function properly and did not meet several material requirements.  The system did not

22  operate materially or substantially as described in the software documentation.  Among

23  other deficiencies, CrossPointe failed to supply software and services that complied with

24  and would enable the District to meet the Arizona Student Accountability Information

25  System statutory reporting requirements.  CrossPointe failed and refused to repair,

26  replace, and upgrade the system.

27      CrossPointe failed and refused to provide competent system support, proper

28  technical information about the system, and reasonable assistance to troubleshoot and

1   resolve problems.  CrossPointe's support personnel were inexperienced and untrained,

2   and they failed to exercise reasonable care and skill to diagnose and resolve the numerous

3   system problems the District experienced.  CrossPointe did not properly train District

4   personnel to utilize the student information system software for its intended purposes.

5          By letter dated April 20, 2010, the District's attorney formally notified

6   CrossPointe that CrossPointe's student information system was materially defective and

7   did not comply with the terms of the RFP.  (Doc. 20-5.)  The letter stated that "the system

8   as partially installed and implemented materially fails to comply with the express

9   representations in CrossPointe's January 10, 2008 proposal."  It "declares CrossPointe in

10  default," but stated that "for the present, the District will not terminate CrossPointe."  The

11  letter identified commitments CrossPointe made on April 1, 2010, to "address and resolve

12  all system deficiencies—without exception—by the end of the school year, May 28,

13  2010."  "In exchange, the District committed to provide a list of deficiencies and to

14  forbear terminating CrossPointe."  The letter identified five most important milestones for

15  achieving by May 28, 2010, full-system installation defined by the implementation and

16  functionality standards set forth in the RFP and the Proposal.  It included two exhibits

17  with detailed information regarding the system's current material deficiencies.

18         The letter also described CrossPointe's failure to achieve the original

19  implementation schedule for the 2008-09 school year, failure to finish system installation

20  and training for partial implementation in February and March 2009, failure to

21  successfully implement the system by the beginning of the 2009-10 school year, and

22  subsequent failure to develop a plan to promptly and fully complete system installation

23  and training.  The District demanded that CrossPointe provide written assurance that

24  CrossPointe would perform the remaining work and cure the identified deficiencies in

25  accordance with the milestone schedule and would finish the project by May 28, 2010.  If

26  CrossPointe did not immediately provide such assurance, the District intended to

27  terminate CrossPointe's rights under the parties' contract.  Finally, the April 20, 2010

28  letter stated that if the District terminated CrossPointe, it would file suit to recover all

1   amounts it had paid for the defective system, plus other damages, fees, and costs allowed

2   by law, but the District would consider a negotiated termination for the parties'

3   convenience that included refund of the system's purchase price plus interest.

4       At some unspecified date, the District terminated CrossPointe's right to perform

5   and procured another vendor to supply a student information system that materially

6   complies with the RFP.  The District cannot and does not use CrossPointe's software as

7   intended, particularly to comply with Arizona state reporting requirements.

8       **F.    The Litigation**

9       On January 12, 2011, the District initiated this lawsuit in the Maricopa County

10  Superior Court.  On March 18, 2011, Defendants CrossPointe and Keebler removed it to

11  federal court based on diversity of citizenship under 28 U.S.C. § 1332.

12      The Amended Complaint uses the term "February 14, 2008 Contract" to refer to a

13  contract formed by the District accepting the Proposal and which incorporates the terms

14  of the RFP and the Proposal.  The Amended Complaint alleges five claims:  (1) breach of

15  the February 14, 2008 Contract; (2) breach of the Master License Agreement; (3) breach

16  of the duty of good faith and fair dealing arising under the February 14, 2008 Contract or

17  the Master License Agreement; (4) conspiracy to defraud; and (5) fraudulent inducement

18  to enter into the February 14, 2008 Contract.[2]

19  **II.    Legal Standard**

20      Dismissal under Fed. R. Civ. P. 12(b)(6) can be based on "the lack of  a cognizable

21  legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

22  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To avoid dismissal,

23

24          [2]The Fourth Claim is titled "Fraud/Damages" and alleges CrossPointe and Keebler
25  conspired with unknown third persons to defraud the District and acted with an evil mind and
    an evil hand.  It seeks punitive damages of at least $2 million.  The Fifth Claim is titled
26  "Fraud/Rescission and Restitution" and alleges CrossPointe's, Keebler's, and the Keebler
    conspiracy's fraud induced the District to enter into the February 14, 2008 Contract.  It seeks
27  to rescind the February 14, 2008 Contract and recover restitution in an amount of not less
28  than the amount the District paid CrossPointe.

1   a complaint must contain "only enough facts to state a claim for relief that is plausible on

2   its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

3   plausibility when the plaintiff pleads factual content that allows the court to draw the

4   reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

5   *Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009).

6          The principle that a court accepts as true all of the allegations in a complaint does

7   not apply to legal conclusions or conclusory factual allegations.  *Id.* at 1949, 1951.

8   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

9   statements, do not suffice."  *Id.* at 1949.  "A plaintiff's obligation to provide the grounds

10  of his entitlement to relief requires more than labels and conclusions, and a formulaic

11  recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

12         Generally, material beyond the complaint may not be considered in deciding a

13  Rule 12(b)(6) motion.  However, evidence on which the complaint "necessarily relies"

14  may be considered if:  "(1) the complaint refers to the document; (2) the document is

15  central to the plaintiff's claim; and (3) no party questions the authenticity of the copy

16  attached to the 12(b)(6) motion."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

17  **III.**   **Analysis**

18         **A.**   **Counts I and III Do Not Fail to State Claims Upon Which Relief Can**
              **Be Granted.**
19
20         CrossPointe contends that Count I and part of Count III fail to state claims upon

21  which relief can be granted because the Master License Agreement superseded the

22  February 14, 2008 Contract, which is the subject of those Counts.  The Master License

23  Agreement stated:  "This Agreement, along with the respective Product Order Forms and

24  attachments, is the complete and exclusive statement of the Agreement between the

25  parties with respect to the System and shall supersede all prior proposals, understandings

26  and all other agreements, oral and written."  (Doc. 23-5 at 12.)  The District contends that

27  the Master License Agreement did not supersede the February 14, 2008 Contract because

28

1   it contravenes the parties' reasonable expectations and was not supported by

2   consideration.

3        **1.    Reasonable Expectations**

4        The District contends that its acceptance of the Proposal formed a fully integrated

5   contract that prohibited amendment except "within the scope of the Contract," and the

6   Master License Agreement was a boilerplate agreement that could not rescind the

7   negotiated contract because it contravened the District's reasonable expectations.

8   CrossPointe contends the reasonable expectations doctrine does not apply because the

9   Master License Agreement was modified and initialed by Dangerfield, assistant

10  superintendent and general counsel for the District.  CrossPointe further contends that the

11  District "is not a powerless consumer that negotiated the [Master License Agreement]

12  with uneven bargaining leverage," but rather "possessed *real power of negotiation*, which

13  [the District] chose to exercise with respect to the choice of law and jurisdiction clauses,

14  but not with respect to the integration clause of the [Master License Agreement]."  (Doc.

15  32 at 2-3.)

16       Arizona recognizes the doctrine of reasonable expectations in limited

17  circumstances.  In *Darner Motor Sales, Inc. v. Universal Underwriter Insurance Co.*, 140

18  Ariz. 383, 682 P.2d 388 (1984), the Arizona Supreme Court adopted the Restatement

19  (Second) of Contracts § 211 (1981) (Standardized Agreements) in the context of

20  enforcing insurance policies:

21          (1)  Except as stated in Subsection (3), where a party to an agreement
            signs or otherwise manifests assent to a writing and has reason to believe
22          that like writings are regularly used to embody terms of agreements of the
            same type, he adopts the writing as an integrated agreement with respect to
23          the terms included in the writing.

24          (2)  Such a writing is interpreted wherever reasonable as treating
            alike all those similarly situated, without regard to their knowledge or
25          understanding of the standard terms of the writing.

26          (3)  Where the other party has reason to believe that the party
            manifesting such assent would not do so if he knew that the writing
27          contained a particular term, the term is not part of the agreement.

28

*Id.* at 391, 682 P.2d at 396. "Subsection (3) of § 211 is the Restatement's codification of and limitation on the 'reasonable expectation' rule as applied to standardized agreements." *Id.* Section 211's comment explains further:

> Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. . . . [A] party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction.

Restatement (Second) of Contracts § 211, cmt. f (1981); *accord Darner*, 140 Ariz. at 391-92, 682 P.2d at 396-97.

In *Broemmer v. Abortion Services of Phoenix, Ltd.*, 173 Ariz. 148, 840 P.2d 1013 (1992), the Arizona Supreme Court applied the reasonable expectations doctrine to the arbitration clause of an adhesion contract. It defined an adhesion contract as:

> . . . typically a standardized form "offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract."

*Id.* at 150, 840 P.2d at 1015 (citations omitted). Under *Broemmer*, an adhesion contract is fully enforceable according to its terms with two limitations: (1) a contract or provision that does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him; and (2) a contract or provision will not be enforced if, in context, it is unduly oppressive or unconscionable, even if it is consistent with the parties' reasonable expectations. *Id.* at 151, 840 P.2d at 1016.

On one hand, although the Master License Agreement contains standardized provisions, the Amended Complaint does not allege that it was offered to the District on a "take it or leave it" basis without opportunity for bargaining. The District was not in a weaker bargaining position. Further, the District's counsel signed it and initialed specific

1   revisions, and the Amended Complaint does not allege he was denied opportunity to

2   review it thoroughly.  On the other hand, to the extent that the Master License Agreement

3   is construed to relieve CrossPointe from all of the promises it made in the Proposal

4   accepted by the District, it would "eliminate the dominant purpose of the transaction" and

5   circumvent the public procurement process, possibly rendering the Master License

6   Agreement unenforceable.[3]  Moreover, CrossPointe had reason to believe that the District

7   would not have assented to CrossPointe's retraction of the Proposal—circumventing the

8   statutorily required public procurement process—if it had understood the Master License

9   Agreement to do that.

10          **2.      Consideration**

11          The District also contends the Master License Agreement was not effective as a

12   substitute for the February 14, 2008 Contract because it was not supported by new

13   consideration.  If parties intend a new contract to replace all provisions of an earlier

14   contract, the contract is a substituted contract, which is not effective unless supported by

15   consideration or some substitute for consideration.  *K-Line Builders, Inc. v. First Federal*

16   *Sav. & Loan Ass'n*, 139 Ariz. 209, 213, 677 P.2d 1317, 1321 (Ct. App. 1983) (applying

17   Restatement (Second) of Contracts § 279 (1981)).  Consideration necessary to modify an

18   existing contract is any benefit to the promisor or detriment to the promisee that supports

19   the new promise.  *Demasse v. IT Corp.*, 194 Ariz. 500, 506, 984 P.2d 1138, 1144 (1999).

20   "To constitute consideration, a performance or return promise must be bargained for."

21   *Schade v. Diethrich*, 158 Ariz. 1, 8, 760 P.2d 1050, 1057 (1988) (quoting Restatement

22   (Second) of Contracts § 71(1) (1981)).  "A performance or return promise is bargained

23   for if sought or given in exchange for the promise of the other party."  *Id.* (citing

24   Restatement (Second) of Contracts § 71(1) (1981)).

25          CrossPointe contends the Master License Agreement provided the District with a

26   benefit through its warranty that CrossPointe would use up-to-date virus scanning and

27   _____

28          [3]The parties did not brief the effect of public procurement law on this dispute.

- 17 -

1    cleaning products and would not, "based on the results of that scanning and cleaning,

2    deliver to the Client Products containing any computer viruses, time bombs, harmful and

3    malicious data, or other undocumented programs which inhibit Product use and

4    operation."  (Doc. 23-5 at 8.)  But this warranty—to run current virus scan software and

5    remove identified dangers before delivering software products to the customers—was

6    plainly implied in the Proposal.  *See* A.R.S. § 47-2314(B)(3) (warranty that goods are fit

7    for the ordinary purposes for which such goods are used is implied in a sales contract).

8         CrossPointe also contends that the Master License Agreement provided the District

9    support services that were not provided under the February 14, 2008 Contract.  The

10   Proposal stated, "CrossPointe provides the desired levels and modes of support as

11   requested by Gilbert Public Schools in RFP #08-031-01-13."  The RFP required

12   telephone, email, and fax support options with "staff available for all types of SIS support

13   system issues to cover the times from two hours prior to school beginning to two hours

14   after the termination of classes for the school day, or 5 p.m. Arizona time whichever

15   comes later."  Further, the Proposal stated that CrossPointe would provide "Live Phone

16   Support" 7:00 a.m. EST to 7:00 p.m. EST.  But the Master License Agreement said

17   CrossPointe would provide only "CrossPointe's standard telephone support available . . .

18   during the hours of 8 a.m. to 5 p.m. EST (excluding weekends and CrossPointe

19   designated holidays."  The Proposal said CrossPointe would provide support services "24

20   x 7 x 365 days via email, fax, and the CrossPointe Support Portal" online.  The Master

21   License Agreement did not mention email, fax, or online support services.  The Proposal

22   set response times for addressing three levels of problems; the Master License Agreement

23   did not.

24        Under the heading "Desired Levels of Maintenance," the Proposal stated:

25        As a component of the maintenance and support fees paid to CrossPointe,
          CrossPointe provides semi-annual (2 updates per year) updates that includes
26        software enhancement, bug fixes, and updates.  These updates are provided
          to Gilbert on a CrossPointe installable basis thereby precluding the need for
27        Gilbert to 'download' and install updates.  Major software enhancements
          are available every 12 -18 months.

28

1    (Doc. 23-1 at 29.)  In contrast, the Master License Agreement stated CrossPointe would

2    provide the District "updates, enhancements, and new releases . . . when generally made

3    available by CrossPointe for installation and use by the Client."  Also, under the Master

4    License Agreement, CrossPointe would only provide support for the "immediate prior

5    Major Release for a period of 12 months after general availability of the then current

6    Major Release" and would alert the District "at least 6 months before the scheduled

7    termination of Support and the Product Warranty for any Major Release."  Finally, the

8    Master License Agreement stated, "CrossPointe will have no obligation to provide

9    support for any Client Modifications until such time as such Client Modification have

10   been incorporated into the CrossPointe Supported Products which have been made

11   available to other CrossPointe customers."  Thus, the Master License Agreement did not

12   provide better warranties, support, and maintenance services than did the Proposal.

13          In its reply, CrossPointe also contends it gave the District more favorable payment

14   terms under the Master License Agreement than under the Proposal because the Proposal

15   demanded payment for license, service, and maintenance fees within 20 days of

16   "execution of the contract" (February 14, 2008) and the Master License Agreement

17   allowed for payment of license fees within 20 days of "board approval" (February 12,

18   2008) and maintenance fees within 60 days after ship date.  Even if it had been timely

19   presented, this argument is not persuasive when the specific terms are considered.

20          The Proposal stated that payment for software license fees, professional services,

21   and year one maintenance (a total of $1,598,813) was due within 20 days of execution of

22   the contract, which would have been March 6, 2008.  Travel expenses for on-site service

23   were to be billed in arrears on actual costs and due within 20 days of receipt.  In its letter

24   of intent to purchase, the District indicated that the purchase had been approved by the

25   Governing Board prior to issuance of the bid and only final arrangements by the lender

26   were pending.

27          Instead of billing actual travel expenses, the Master License Agreement

28   incorporated a fixed bid price of $75,000 for travel expenses into "Project Fees."  It

required payment of the license fees and one-third of the Project Fees (a total of $1,217,767) by March 4, 2008. A payment of $111,513 would have been due in early May 2008, and a payment of $172,267 due about May 15, 2008. The final payment of $172,266 would have been due August 21, 2008. Thus, the Master License Agreement charged the District $75,000 for travel expenses regardless of whether and when they were actually incurred, but extended payment of $456,046 over several months. On the facts alleged in the Amended Complaint and the documents attached to or central to the Amended Complaint, it cannot be concluded that extending the payments over several months or charging a fixed price of $75,000 for travel expenses not yet incurred would benefit the District. Therefore, as alleged, the Master License Agreement's payment terms did not confer a benefit on the District or a detriment on CrossPointe.

Therefore, although the Master License Agreement stated that it was "the complete and exclusive statement of the Agreement between the parties" and would "supersede all prior proposals, understandings and all other agreements," assuming facts alleged by the District to be true for the purpose of this Rule 12(b)(6) motion, the Amended Complaint adequately alleges claims for breach of the February 14, 2008 Contract and breach of the covenant of good faith and fair dealing implied in the February 14, 2008 Contract. CrossPointe's motion to dismiss Count I and part of Count III of the Amended Complaint will therefore be denied.

**B.      Counts IV and V Fail to State Claims Upon Which Relief Can Be Granted.**

CrossPointe contends that the District's fraud claims are barred by the economic loss doctrine, which limits a contracting party to contractual remedies for the recovery of purely economic loss unaccompanied by physical injury to persons or other property. *See Flagstaff Affordable Housing Limited Partnership v. Design Alliance, Inc.*, 223 Ariz. 320, 323, 223 P.3d 664, 667 (2010). Arizona law defines "economic loss" as "pecuniary or commercial damage, including any decreased value or repair costs for a product or property that is itself the subject of a contract between the plaintiff and defendant, and

1    consequential damages such as lost profits." *Id.*  The Arizona Supreme Court has applied

2    the doctrine to construction defect and strict product liability claims.  *Id.* at 326-27, 223

3    P.3d at 670-71; *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse*

4    *Elec. Corp.*, 143 Ariz. 368, 694 P.2d 198 (1984).

5         In *Flagstaff*, the Arizona Supreme Court explained that application of the

6    economic loss doctrine depends on context-specific policy considerations.  223 Ariz. at

7    325, 223 P.3d at 669.  Contract law "seeks to encourage parties to order their prospective

8    relationships, including the allocation of risk of future losses and the identification of

9    remedies, and to enforce any resulting agreement consistent with the parties'

10   expectations." *Id.*  Tort law promotes safety by deterring accidents and spreads the loss

11   from accidents.  *Id.*  The policies of accident deterrence and loss-spreading do not require

12   permitting tort recovery in addition to contract remedies in the context of construction

13   defects that are not accompanied by physical injury to persons or other property.  *Id.*

14   Thus, "a plaintiff who contracts for construction cannot recover in tort for purely

15   economic loss, unless the contract otherwise provides." *Id.* at 326-27, 223 P.3d at 670-

16   71.

17        In *Cook v. Orkin Exterminating Company*, 227 Ariz. 331, 258 P.3d 149 (2011), the

18   Arizona Court of Appeals applied the economic loss doctrine to bar tort claims related to

19   a company's failure to eradicate termites from a residence.  Although the parties had

20   executed a written contract, the plaintiffs claimed that the written contract did not

21   represent their negotiations and that the defendant had promised it would effectively treat

22   the termites, provide lifetime termite coverage for an annual fee, and repair any new

23   termite damage to the plaintiffs' home and furnishings.  258 P.3d at 150.  The plaintiffs

24   alleged they relied on the defendant's oral promises in deciding to hire the defendant.

25   The written contract did not contain the defendant's alleged promise that its treatment

26   would be effective.  The plaintiffs alleged claims for breach of contract, breach of the

27   implied covenant of good faith and fair dealing, breach of warranty, breach of fiduciary

28   duty, negligence, negligent and intentional misrepresentation, and fraud.  The court found

1   no strong policy reason to impose tort liability where there was no injury besides that to

2   the subject property and the plaintiffs sought remedies for purely economic loss from the

3   defendant's alleged failure to adequately perform its promises under the contract.  *Id.* at

4   153.  The court specifically rejected the plaintiffs' argument that the economic loss

5   doctrine did not apply to their fraud and misrepresentation claims.  *Id.* at 153 n.6.  Thus,

6   the plaintiffs were limited to their contractual remedies.  *Id.* at 153.

7          Applying Arizona law, district courts have made context-specific findings to

8   determine whether the economic loss doctrine bars certain tort claims.  In *Henderson v.*

9   *Chase Home Finance, LLC*, No. CV09-2461, 2010 WL 1962530 (D. Ariz. May 14,

10  2010), the district court found that the plaintiffs were not seeking any damages that were

11  the subject of a contract between the parties, but rather damages for their lowered credit

12  scores, loss of access to an otherwise accessible line of credit, and for late fees assessed as

13  a result of the defendants' actions.  Thus, the economic loss doctrine did not preclude the

14  plaintiffs' negligent misrepresentation claim.

15         In *Wilson v. GMAC Mortgage, LLC*, No. CV11-0546, 2011 WL 4101668 (D. Ariz.

16  Sept. 14, 2011), the district court declined to dismiss fraud claims as precluded by the

17  economic loss doctrine where the plaintiff alleged defendants implied he would be

18  approved for a loan modification and falsely represented to him in a settlement agreement

19  that they would enter into a loan modification in order to secure his signature and

20  payment of approximately $45,000.  The court explained the danger of applying the

21  doctrine too broadly:

22         The doctrine is designed to honor parties' expectations by limiting recovery
           to contract remedies for loss of the benefit of the bargain.  Holding
23         contractual parties to agreed-upon remedies is appropriate when, as contract
           law presumes is the case, parties are on equal footing and have had an
24         opportunity during negotiations to allocate risks.

25                A formulation of the economic loss doctrine that eliminates recovery
           under all tort theories, however is overly broad.  And in the case of fraud, a
26         tort specifically designed to remedy economic harm, the doctrine is
           especially inappropriate.  When fraudulent conduct infects contract
27         negotiations, the presumption that the parties engaged in an equal
           negotiation evaporates.  Thus, it is unreasonable to restrict a party to
28         contractual liability when fraud created an unequal bargaining environment.

                                        - 22 -

1         Because fraud creates only economic damages, applying the economic loss
      doctrine to fraud claims would eliminate this tort. To do so would release a
2         party from liability for even intentionally fraudulent behavior.

3   *Id.* at *2 (internal quotation marks and citations omitted).

4         In *TSYS Acquiring Solutions, LLC v. Electronic Payment Sys.*, No. CV10-1060,

5   2010 WL 3882518 (D. Ariz. Sept. 29, 2010), the defendant contracted for the plaintiff to

6   provide credit card payment processing services for merchants whom the defendant

7   services. The court found that both parties were commercial entities who anticipated a

8   possible breach of their commercial contract. Considering the policy of encouraging

9   parties to such contracts to allocate risk prospectively and identify remedies within their

10  agreements, the court found the economic loss doctrine applied to the contract. It

11  dismissed a conversion claim as barred by the doctrine because the harm alleged was the

12  failure to receive the property promised by the parties' contract and not some separate

13  harm. Under the doctrine, it also dismissed a fraud claim that did not allege fraud in the

14  inducement but only in the performance of the contract, which caused the same type of

15  harm that was foreseeable in a breach. It did not, however, dismiss a separate claim for

16  fraud in the inducement because the injury could be separate from the injury caused by

17  the contract's breach.

18        Here, both parties were sophisticated and of equal bargaining power. They

19  anticipated a possible breach of their commercial contract. The Amended Complaint

20  seeks recovery of purely economic loss unaccompanied by physical injury to persons or

21  other property. Permitting recovery in tort would not promote safety or spread the loss

22  from accidents.

23        Count IV of the Amended Complaint alleges Defendants conspired "to defraud the

24  District in connection with the student information system RFP" and representations

25  made in the Proposal were false. It alleges that Defendants' purpose was to obtain an

26  award of contract, prevent the District from receiving benefits of the contract, and

27  "manipulate the Contract to CrossPointe's advantage by attempting to rescind it through

28  the master license agreement." But it does not allege that CrossPointe fraudulently

1   induced the District to execute the Master License Agreement and that any harm resulted

2   from doing so.  It does not allege any injury separate from the injury caused by breach of

3   either the February 14, 2008 Contract or breach of the Master License Agreement.  It

4   alleges only that the software did not perform as promised and, as a result, "the District

5   has sustained general, special, consequential, and incidental damages in an amount to be

6   proven at trial."  Count IV is therefore precluded by the economic loss doctrine.

7         Further, Count IV summarily alleges that the District is entitled to punitive

8   damages of not less than $2 million because Defendants' conduct was extreme and

9   outrageous, "fraudulent and socially contemptible," and performed "with an evil mind

10  and an evil hand."  These conclusory allegations do not state a claim upon which relief

11  can be granted.

12        Count V of the Amended Complaint alleges that Defendants' fraudulent

13  representations induced the District to enter into the February 14, 2008 Contract, but it

14  does not allege that CrossPointe made any fraudulent representations other than the

15  Proposal, which was incorporated into the February 14, 2008 Contract.  Count V further

16  alleges that the District relied on fraudulent representations and paid $1.7 million for a

17  worthless student information system.  Like Count IV, it essentially alleges breach of

18  contract, but seeks rescission and restitution, which are remedies and not independent

19  causes of action.  Because Count V is substantially equivalent to Count IV, it also is

20  precluded by the economic loss doctrine.

21        Therefore, CrossPointe's motion to dismiss Counts IV and V of the Amended

22  Complaint will be granted, and CrossPointe's arguments regarding Counts IV and V's

23  allegations of Keebler's individual liability for fraud are moot.  Because leave to amend

24  should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), the District

25  will be granted leave to amend Counts IV and V of the Amended Complaint.

26        IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Amended

27  Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 23) is denied as to Counts I and III

28  and granted as to Counts IV and V.

1     IT IS FURTHER ORDERED that, if it so elects, Plaintiff may file a Second

2   Amended Complaint by January 13, 2011.

3     DATED this 9th day of December, 2011.

4

5   _____

          Neil V. Wake
6     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28